# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| OPS 2, LLC, | Case No.: 2:08-cv-00967-RLH-LRL |
| Plaintiff, | **O R D E R** |
| vs. | (Motion for Summary Judgment–#43; Counter Motion for Summary Judgment–#48; Motion to Strike–#54) |
| COUNTY OF CLARK, EX REL. UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA, | |
| Defendant. | |

Before the Court is Defendant County of Clark, *ex rel*. University Medical Center of Southern Nevada's ("UMC") **Motion for Summary Judgment** (#43), filed February 20, 2009. Also before the Court is OPS 2's **Cross-motion for Summary Judgment** (#48), filed March 11, 2009. Finally, before the Court is OPS 2's **Motion to Strike** (#54), filed April 13, 2009. The Court has also considered the various responses and replies and each parties' supplemental brief to the motions for summary judgment.

## BACKGROUND

On March 11–12, 2006, Defendant UMC published an invitation for the public to bid on an Accounts Receivable Sale in the Las Vegas Review Journal. UMC offered to sell over

1

750,000 charged-off consumer healthcare accounts to the highest responsive and responsible bidder. The invitation to bid contained a number of special provisions and an important addendum ("March 24 Adendeum"). Special provision 13, which was part of the invitation to bid, stated that "in the event [UMC] elects to repurchase or replace ineligible Accounts due to a filed bankruptcy or documented death certificate notification, an account of equal value . . . may be substituted." (Dkt. #43, Mot. Ex. B.) However, on March 24, 2006, UMC issued an addendum to the invitation to bid, indicating that there would be "no replacement accounts." (Dkt. #43, Ex. C.)

Plaintiff OPS 2 alleges that after the March 24 Addendum was published, it learned UMC had "authorized attempts to settle some of the charged-off accounts that were included in the invitation to bid." (Dkt. #48, Mot. 6.) Anurag Sett, OPS 2's President and CEO, emailed Steve Helvie, UMC's contracts supervisor, to inquire about these accounts. Helvie responded, "If it turns out that an account was submitted in error with a structured settlement, we will provide a substitute account." (Dkt. #49, App. Ex. A–4.) When Sett inquired regarding the contents of OPS 2's offer to purchase the charged-off accounts, Helvie also indicated that OPS 2 could make a bid that was "contingent on contract." (*Id.*) OPS 2 alleges it relied on Helvie's representations when compiling its bid. On April 6, OPS 2 submitted a written bid of 8.5 million dollars to purchase the accounts. In its bid proposal, OPS 2 acknowledged receipt of the March 24 addendum. It also indicated that its bid proposal was "contingent on mutual agreement [regarding the] Purchase and Sale Agreement." (*Id*. Ex. A–6) OPS 2's bid was 56% larger than the next highest bid.

On April 11, 2006, UMC selected OPS 2's bid and informed OPS 2 that Donald Haight, UMC's Executive Director of Contract Management, would be "its contact for contract and settlement." (*Id*. Ex. A–7.) The next day, OPS 2 submitted a proposed Account Purchase Agreement to Haight. On April 19, 2006, the UMC Board of Trustees ("Board") unanimously approved OPS 2's bid and authorized Lacy Thomas, UMC's Chief Executive Officer, "to sign the necessary documents to effectuate the sale." (Dkt. #43, Mot. Ex. F.) UMC alleges that Thomas

and Sett agreed to certain contractual provisions without the knowledge or approval of the Board or the Clark County District Attorney's Office.

The proposed Account Purchase Agreement which OPS 2 sent to Haight stated in Section 7.2 that UMC would provide substitute accounts if: (1) the debtor has deceased; (2) the debtor has entered into bankruptcy; (3) the debtor proves a defense to payment based on UMC's acts or omissions; (4) the account was created as a result of fraud, forgery, or mistake; (5) the account was paid or settled prior to the signing of the Account Purchase Agreement; (6) the account is the subject of litigation; (7) the debtor is represented by counsel; (8) the debtor is eligible for Medicaid, Worker's Compensation, or other governmental aid; (9) UMC overcharged for medical services on the account; or (10) an account is past due because insurance benefits were denied due to untimely filing.  (Dkt. #43, Mot. Ex. G.)

On April 26, 2006, Haight revised OPS 2's proposed Account Purchase Agreement. He did not materially alter Section 7.2, though he did make some minor technical changes.  OPS 2 alleges that the parties subsequently exchanged another draft of this agreement.  (Dkt. #49, App. Ex. A.)  On May 10, 2006, Haight sent OPS 2 a "final draft" of the Account Purchase Agreement and stated:

> Attached please find the final draft of the Account Purchase Agreement . . . . The [District Attorney] thinks the Account Purchase Agreement is an attempt to change the terms of the contract.  Accordingly, I have been instructed to advise you that if Orion [OPS 2] does not accept the attached draft by 5:00 pm Eastern Daylight Savings Time on Monday, May 11, 2006, UMC will consider Orion in breach of contract, award the contract to the second highest bidder on May 16, 2006, and proceed with legal action to recover damages.

OPS 2 agreed to this contract immediately.  According to OPS 2 this "final draft" contained only minor changes to Section 7.2 from the time OPS 2 first submitted it to Haight on April 12, 2006. Sett signed the contract on behalf of OPS 2, and Thomas signed on behalf of UMC.

After the contract was finalized, OPS 2 asked UMC to substitute a number of accounts under Section 7.2 of the Account Purchase Agreement.  OPS 2 alleges it provided

3

1  documentation to support its request, but UMC refused to provide substitute accounts.  OPS 2 also
2  claims UMC breached the Account Purchase Agreement by refusing to provide online access to its
3  records storage system and by failing to provide information to verify that the debtors received
4  services at UMC.
5        On July 25, 2008, OPS 2 filed suit in this Court for breach of contract, breach of the
6  covenant of good faith and fair dealing, and unjust enrichment.  OPS 2 also requested declaratory
7  relief regarding UMC's obligations under the Account Purchase Agreement.  On February 20,
8  2009, UMC filed its Motion for Summary Judgment (Dkt. #43).  OPS 2 opposed this motion and
9  filed a Countermotion for Summary Judgment (Dkt. #48) on March 11, 2009.  On April 13, 2009,
10  OPS 2 also filed a Motion to Strike Floyd Steven's Affidavit, attached to UMC's motion, from the
11  record.
12        The Court determined that two of the key questions presented in the cross-motions
13  for summary judgment were matters of first impression under Nevada law.  The issues were: (1)
14  whether NRS § 332.185 requires local governments to dispose of personal property through the
15  competitive bidding process, and (2) whether strict compliance with the bidding requirements is
16  required when NRS § 332.185(1) allows for compliance "as nearly as possible."  Consequently, on
17  June 9, 2009, this Court certified the two questions to the Supreme Court of Nevada.  The parties
18  argued the two questions before the Nevada Supreme Court, which issued its opinion in October.
19  *Orion Portfolio Serv. 2, LLC v. Cty of Clark ex rel. Univ. Med. Ctr. of S. Nev.*, No. 53969, 126
20  Nev. Adv. Op. 39 (Nev. Oct. 14, 2010) (Dkt. #72).  With the opinion from the Supreme Court of
21  Nevada the cross motions for summary judgment are now ripe for adjudication.  For the reasons
22  set forth below, the Court denies both motions for summary judgment and the motion to strike.
23  /
24  /
25  /
26  /

AO 72
(Rev. 8/82)

**DISCUSSION**

**I.     Cross-motions for Summary Judgment**

    **A.     Legal Standard**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir.1994). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171 (1996). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific

evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Bank of America v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).

**B. Analysis**

Whether a variation between the invitation to bid and the eventual contract is material "is a mixed question of law and fact." *Orion Portfolio Serv.*, 126 Nev. Adv. Op. 39, at 13. The fact finder must consider whether the deviation affected the amount of the bid, gave the bidder an advantage or benefit over the other bidders, and whether it was a vehicle for favoritism. *See Pascoe v. Barlum*, 225 N.W. 506, 507 (Mi. 1929). Here, the final APA varied from the bid terms, but it is unclear whether the variation was material. Here, OPS 2 bid over 50% more than any other bidder. (Dkt. #43 Mot. Ex. F, Board of Trustees Agenda Item.) This substantial deviation could be because OPS 2 was more confident in its ability to collect than the other bidders or because allowing for account substitution was material and materially affected the bid amount. It could also be that OPS 2 merely valued the contract more and the substitution provisions were immaterial. There are also other possibilities. These material factual issues must not be determined on a motion for summary judgment. For this and other reasons, the Court finds that triable issues of fact remain and therefore denies both motions for summary judgment.

**II.    Motion to Strike**

The Court did not rely on Floyd Steven's affidavit and Steven's affidavit would not have changed the result of the summary judgment motions. Therefore the Court need not address the affidavit and whether it was proper. Therefore the Court denies the motion to strike as moot.

/

/

/

/

AO 72
(Rev. 8/82)

## CONCLUSION

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Defendants's Motion for Summary Judgment (#43) is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Cross Motion for Summary Judgment (#48) is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike (#54) is DENIED as moot.

Dated: January 3, 2011.

_____
ROGER L. HUNT
Chief United States District Judge