**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

**\* \* \***

| | |
|---|---|
| OPS 2, LLC,<br><br>      Plaintiff,<br><br>  vs.<br><br>COUNTY OF CLARK, EX REL.<br>UNIVERSITY MEDICAL CENTER OF<br>SOUTHERN NEVADA,<br><br>      Defendant. | Case No.: 2:08-cv-00967-RLH-VCF<br><br>**FINDINGS OF FACT,<br>CONCLUSIONS OF LAW, and<br>DECISION** |

   This matter having come on for trial before the Court on April 23, 24, 25, 26, 27, and 30, 2012, the Parties having appeared by and through their respective counsel, and the Court having heard the testimony of witnesses and having considered all exhibits accepted into evidence at trial, the Court now renders its Findings of Facts, Conclusions of Law, and Decision, as follows:

**I.  FINDINGS OF FACT**

   1.  On March 11 and 12, 2006, UMC published in the Las Vegas Review-Journal an Invitation to Bid No. 2006-06 ("ITB"), Accounts Receivable Sale, for the sale of approximately 766,000 in one lot of charged-off consumer healthcare accounts (the "Portfolio") from UMC. (Ex. 305, Invitation to Bid p. 1; Ex. 302 Addendum No. 1 p. 1.)

AO 72<br>(Rev. 8/82)

2.     UMC intended to obtain a quick influx of cash for a one-time transaction with the highest responsive and responsible bidder and to transfer all the subject accounts to the successful bidder without further obligations.

3.     UMC is a county hospital and the only "safety net" hospital (meaning indigent patients or patients without insurance are funneled there for medical care) in Clark County.

4.     UMC, up to that at the time, had had contracts with Allied Collection Services, Inc. ("Allied"), Aargon Collections, Inc. ("Aargon"), and two other collection agencies, to handle third-party collections of accounts more than 90/120 days old; these companies retained a percentage of the amount collected per contract.  They were assigned to collect primary debt and are considered first-party collectors.

5.     Primary debt collections generally have much higher collection rates than secondary debt collections; furthermore, accounts which are newer (from the date of service) are generally more collectible than older accounts.

6.     UMC indicated in the Las Vegas Review-Journal advertisement that the bid package was available for pick-up by prospective bidders.

7.     Patient level data reflecting the specific account receivables being purchased was furnished to bidders on a CD-ROM if the prospective bidders signed a Business Associate Agreement. (Ex. 305 p. 8.)

8.     The ITB contemplated a public opening of bids and a procurement process following the competitive bidding strictures of the Nevada Revised Statutes of Chapter 332 providing a level playing field for all bidders and prospective bidders and protection of the public interest as well through transparency, fairness and increased competition.

9.     The purpose behind a public bid opening is to ensure the public is aware of the amounts being received for the specific services or goods listed in the solicitation.

10.     An overriding purpose of public bidding is to maximize competition and thereby avoid contracts for which proposals are received from only one company.

AO 72
(Rev. 8/82)

11.     A public bid opening is an important mechanism by which the public can police the fairness and integrity of the bidding system. The purpose of a public bid opening is to ensure that the public knows at the time of bid opening exactly how much is being paid by the successful bidder for government property.

12.     The public disclosures of an open bid process furthers the integrity of the public bidding system.

13.     Prior to a bid opening, a bidder is not supposed to know the other bid prices, or even the number of bids which have been submitted.

14.     This serves to enhance competition, because it requires bidders to submit their most competitive possible offer before bid opening.  Consequently, it benefits the public by ensuring the municipal entity is either using its money wisely or getting the best price for any sale.

15.     A bidder gains an unfair advantage when it can negotiate additional or different terms and conditions or change the terms and conditions of the invitation with the Seller after the other bids have already been exposed.

16.     Other bidders are also disadvantaged if they were not given equal opportunity to bid on additional terms which are only negotiated after the bid opening.

17.     In addition, allowing a bidder an opportunity to explain an ambiguous or conditional bid after bid opening provides an unfair advantage as well because the bidder has already seen the other bid prices and any proposed bid deviations.  If a bidder decided that its bid was too low, or too high, the bidder could then explain its bid in a way which necessitated rejection, thereby relieving itself of the requirement to submit a non-revocable bid.  Alternatively, the bidder could attempt to negotiate additional and more favorable contract terms.

18.     The negotiation of different terms after the bid opening violates the competitive bidding hallmark of transparency as well.  The damage to the competitive process directly prejudices the public and material deviations prejudice competitive bidding.

/

19.     The ITB published by UMC in March of 2006 included, *inter alia*, the following

General Provisions:

1.     INTENT OF INVITATION
In accordance with the terms and conditions provided in this bid document, it is the intent of this formal Invitation to Bid to receive bids from qualified Bidders for the items specified in this document. (Ex. 305 p. 2.)

10.     ADDENDA AND INTERPRETATIONS
If it becomes necessary to revise any part of this bid, a written addendum will be provided to all Bidders in written form from the Owner's designated contact as specified in this bid document.  Owner is not bound by any oral representations, clarifications, or changes made in the written requirements and/or specifications by Owner's employees, unless such clarification or change is provided to bidders in written addendum form. (Ex. 305 p. 2.)

13.     DOCUMENT REVIEW

Bidders may visit the Materials Management Department, during normal business hours, to review any current bid documents.  This information is available for review provided the contents of the document have not been deemed confidential or proprietary as defined in the "Confidential/ Proprietary Information" clause in the General Provisions.  Bids submitted in response to this invitation to bid may be reviewed after the formal bid opening has been completed.  To review bid documents, an appointment must be made in advance to ensure that full consideration will be provided.  Please call telephone number (702) 383-2307 to schedule your appointment. (Ex. 305 p. 3.)

14.     PREPARATION OF FORMS

All bids will be submitted on the Bid Form provided in this document.  **All figures must be written in ink or typed**.  Figures written in pencil or containing erasures are not acceptable and will be rejected.  However, mistakes may be crossed out and corrections may be inserted adjacent thereto and initialed in ink by the person signing the proposal.  If there are discrepancies between unit prices and bid and the extended total, the unit price will prevail. (Ex. 305 p. 3 (emphasis in original).)

18.     SUBMISSION OF BIDS

**All bids must be submitted in a sealed envelope plainly marked with the name and address of the Bidder and the bid number and title.** Bidders are requested to submit one (1) copy of the Bid Form and 1 copy of all requested attachments <u>unless otherwise specified</u>.  No responsibility will attach to the Owner, or any official or employee thereof, for the pre-opening of, post opening of, or the failure to open a bid not properly addressed and identified.  Bids are time-stamped upon receipt.  Bids time-stamped 3:01 p.m. or after will be returned unopened to the Bidder.  **FAXED BIDS ARE**

**NOT ALLOWED AND WILL NOT BE CONSIDERED**.  Bidders and other interested parties are invited to attend the bid opening. . . .   (Ex. 305 p. 3 (emphasis in original).)

27.     PROTESTS (OVER $500,000)

Any bidder who submits a bid for this project and is allegedly aggrieved in connection with this solicitation or award of this contract may protest.  The protest must be submitted in writing to the Contracts Supervisor, within 7 calendar days after the bid opening date.  If the protest is not resolved by mutual agreement, the Contracts Supervisor will promptly issue a decision in writing to the protestor.  Within 3 working days of receipt of the decision, a protestor may submit to the Director of Materials Management or designee its written notice of intent to appeal the decision to the BCC. The Director of Materials Management or designee will notify the protestor of the date they may appear to present their appeal to the BCC.  The decision of the BCC will be final.  The BCC need not consider protests unless this procedure is followed. (Ex. 305 p. 5.)

33.     TERMINATION FOR CONVENIENCE

The Owner reserves the right to terminate the contract in whole or part at any time whenever the Owner shall determine that such a termination is in the best interest of the Owner without penalty or recourse upon 30 calendar days written notice of intent to terminate.  In the event that the Owner elects to terminate the contract, the termination request will be submitted to the BCC or the Clark County Finance Department for approval. (Ex. 305 p. 5.)

34.     TERMINATION FOR CAUSE

If the successful Bidder fails to perform in accordance with the agreed terms, conditions, or warranties applicable to this contract, the Owner may immediately cancel all or part of the contract upon written notice of intent to cancel without any liability by the Owner to the successful Bidder.  In the event of cancellation for cause, the Owner may cancel any delivery or service and purchase the product or service elsewhere on such terms or in such a manner as the Owner may deem appropriate, and successful Bidder shall be liable to Owner for any excess cost or other expenses incurred by the Owner. (Ex. 305 p. 5.)

20.     The ITB further included the following General Conditions:

2.      NOTICE OF AWARD

Award of this bid will be by "Letter of Award" issued by the Purchasing Analyst, with the issuance of a purchase order.  The contract shall include this Bid Document, any associated Addendums, and the Bid Form as signed by the successful Bidder. (Ex. 305 p. 6.)

8.      BIDDER'S REPRESENTATION

AO 72
(Rev. 8/82)

Each Bidder, by submitting a bid, represents that it has read and understands the bidding documents and the bid is made in accordance therewith, and it has familiarized itself with the local conditions, laws and regulations under which the work is to be performed and have correlated this knowing with the requirements of the bidding documents. (Ex. 305 p. 6.)

9.   BID DOCUMENTS NECESSARY FOR SUBMITTAL

The Bid Form, all requested attachments, and the bid security (if required) shall be included in the envelope containing the bid. These documents, together, comprise a bid. Omission of, or failure to complete, any portion of the required documents at the time of bid opening may be cause to reject the entire bid. (Ex. 305 p. 6.)

10.   ADDITIONAL BID SUBMITTALS
Any additional agreements, terms, conditions, or exceptions to the bid requirements that are submitted with the Bidders Bid Form may be considered substantial deviations from the bid requirements and cause for rejection. (Ex. 305 p. 6.)

21.   The ITB included the following Special Provisions providing information regarding the subject accounts:

SP. 3   Average Account Balance - $878.00.

SP. 5.   Accounts Residing in the State of Nevada - 97%

SP. 6.   Accounts Residing in Clark County - 91%

SP.13.   General Specification for Repurchase or Replacement Accounts

A).   Seller reserves the right to repurchase any and all accounts at the purchase price.

B).   In the event Seller elects to repurchase or replace ineligible Accounts due to a filed bankruptcy or documented death certificate notification, an account of equal value and aging within a 60-day plus or minus range may be substituted. (Ex. 305 p. 13.)

SP.14.   Determination of the highest responsive and responsible bidder as it applies to this Price Sheet matrix, will be at the discretion of the Seller. . . . (Ex. 305 p. 14.)

SP.15.   The Seller also reserves the right not to make an award if it is deemed that no single bid fully meets the desired outcome of this offering. (Ex. 305 p. 14.)

SP.16.   A compact disc containing portfolio information will be distributed at the Pre-Bid Meeting. Bidders not planning or attending the pre-bid, should

AO 72
(Rev. 8/82)

notify the designated contact to make arrangements for the transfer of this information.  A HIPAA agreement will be prepared and require a signature prior to release of the Account Portfolio. (Ex. 305 p. 14.)

22.     The ITB General Provisions included an indemnity clause whereby the successful bidder shall indemnify UMC from any claims arising out of the acts, or fault of the successful Bidder and its agents. (Ex. 305 p. 2.)

23.     The ITB General Conditions included an insurance clause whereby the successful bidder shall carry insurance with a minimum amount of 1 million per occurrence and 2 million aggregate for the duration of the contract. (Ex. 305 p. 6.)

24.     The ITB also contained a section entitled DEVIATIONS TO BID.  It stated:

The bidder will list on a separate sheet of paper, any deviations to the conditions of this bid.  This sheet will be labeled, "Deviations to Bid Conditions" and will be attached to the Bid Form.  If no exceptions are stated, it will be understood that all terms and coditions will be complied with. ANY DEVIATIONS MAY BE CONSIDERED SUBSTANTIAL AND BE CAUSE FOR REJECTION. (Ex. 305 p. 16.)

25.     The ITB did not contain any terms authorizing incorporating into the bid a separate, subsequent purchase and sale agreement negotiated between the highest bidder and UMC.

26.     The ITB did not contain any terms indicating the successful bidder would have on-line access to UMC patient or billing information after transfer of the accounts.

27.     The ITB did not indicate UMC would be responsible for obtaining hard copies of documents for the accounts sold to the successful bidder.

28.     The ITB did not indicate UMC would waive immunity for any liability arising from the bid or a resulting contract or pay attorney fees for a dispute arising out of the resulting contract.

29.     The ITB did not indicate UMC would conduct a scrub of the accounts on the disc for bankruptcies and deaths at UMC's cost or that the purchase price would be reduced in any way as a result of such a scrub.

30.     On March 24, 2006, UMC issued Addendum No. 1 to Bid No. 2006-06 which deleted Special Provision 1 and 2 and replaced them with the following:

AO 72
(Rev. 8/82)

31.     Special Provision 1 and 2 were changed to the following:

SP.1    Total amount of account receivables portfolio - $681,246,890.28.  Less payments and adjustments posted prior to the transfer date or withheld due to current payment arrangements/judgments.  <u>There will be no replacement accounts</u>.

SP.2    Number of Accounts-766,879, less accounts that are paid/adjusted to zero prior to transfer date or withheld due to current payment arrangements/judgments.  <u>There will be no replacement accounts</u>.  (Ex. 302 p. 1 (emphasis in original).)

32.     Addendum No. 1 also replaced Special Provision 4 with the following details concerning the account portfolio:

Accounts aged.  Three (3) to Twenty (20) years.  The oldest account transferred to B/D in 1986.  The breakdown per year is as follows:

1986-1995           3,843 accounts @ $3,957,461.39
1996-1999           238,998 accounts @ $200,753,903.38
2000 - DEC. 2003    524,038 accounts @ $476,535,525.51
(Ex. 302 p. 2.)

33.     Addendum No. 1 also added the following Special Provision:

SP. 18  Medicare Reporting

As a participating provider of patient care in the Medicare program, UMC is required by federal regulation to report amounts recovered on patient accounts relating to deductibles and coinsurance that UMC previously claimed for reimbursement as Medicare bad debts.  Therefore, the buyer agrees to provide to UMC upon request and with 10 calendar days, the following information for each Medicare patient account included in the sale that money is subsequently collected on:

1.      Patient account number assigned by UMC
2.      Patients Social Security Number
3.      Date each collection is received
4.      Amount of each collection
(Ex. 302  p. 2.)

34.     Also, on March 24, 2006, UMC submitted in writing to all bidders answers to questions submitted by prospective bidders at the pre-bid meeting (which OPS2 did not attend).

35.     UMC indicated in answer to a question that the accounts were initially worked by the internal collection department at UMC which sent two statements and a final notice sent on the 70th day from service before the accounts were placed with collection agencies.  Accounts with balances greater than $2,000 also received two phone calls by UMC before transfer.  Accounts with balances greater than $10,000 required a credit report before transfer. (Ex. 302 p. 3.)

36.     UMC indicated in answer to a question that all accounts had been placed for first party collections and that the collection agencies were required to send notices and make calls.  All accounts are reported to Trans Union and one other credit reporting entity 90 days from placement. (Ex. 302 p. 3.)

37.     UMC indicated, in answer to a question, that no transferred account had been reduced to legal judgment. (Ex. 305 p. 3.)

38.     UMC was also asked what percentage of accounts had been "offered a structured settlement" and the answer given was "none." (Ex. 305 p. 3 (emphasis added).)

39.     An offer to engage in settlement discussions, or even to enter a settlement, does not constitute a "structured settlement."

40.     UMC indicated, in answer to a question regarding what supporting documentation would be made available, that "**Patient will be able to request itemized charges and medical records.  Records will be paper copies.**" (Ex. 305 p. 3 (emphasis in original).)

41.     In answer to a question about the last date the accounts were scrubbed for bankruptcy filings and deaths, UMC answered: "**All accounts were scrubbed for bankruptcies on initial assignment.  One agency scrubs the accounts periodically after assignment.**" (Ex. 305 p. 3 (emphasis in original).)

42.     UMC also clarified questions posed regarding the inapplicability of several sections in the ITB as they were mistakenly included and had to do with competitive bids where UMC was a buyer as opposed to a seller. (Ex. 302 p. 4.)

/

AO 72
(Rev. 8/82)

43.     On March 29, 2006, UMC issued Addendum No. 3 to Bid No. 2006-06 that deleted and replaced Special Provision 9.  It stated:

> A cashiers check from the <u>highest</u> bidder will be required by 10:00 am, PST, of the Board of County Commissioners meeting on April 18, 2006.  A check or letter of credit is no longer required by the Board meeting.  A matrix ranking the bids submitted will be distributed on April 7, 2006 to all bidders. (Ex. 304 (emphasis in original).<u>)</u>

44.     Neither the ITB nor the amendments contained language requiring UMC to repurchase or replace any of the accounts identified as "one lot" of consumer healthcare accounts with UMC consumer healthcare accounts newer than December 31, 2003.

45.     Mr. Anurag Sett ("Sett"), the principal of OPS2, consulted with Michael Feeney ("Feeney") and Duane Christy ("Christy"), the respective principals of Allied and Aargon, on how their companies were handling collection of the subject accounts and their opinions of the value of these accounts.  Feeney and Christy told Sett they had authorization to offer debtors a discount on bills and utilized this discretion in their collection efforts. Christy also told Sett about a communication from Lee Myers ("Myers") urging UMC's collection agencies to offer discounts on their accounts for a two-week period in April 2006.  Sett confirmed this settlement discussion via e-mail communication with Steve Helvie ("Helvie") before OPS2's bid was submitted. (Ex. 8.)

46.     Accordingly, Sett had knowledge of how these collection agents approached the debtors and attempted to obtain payment or reach a settlement accord.  Sett had actual knowledge prior to OPS2's bid submission that some of the debtors were given an opportunity to contact the collection agency for settling their debts.

47.     Prior to submitting its bid, OPS2 entered into an agreement with Aargon to handle collection efforts on the accounts if it was awarded the bid and UMC's accounts receivables portfolio was transferred to OPS2.

48.     The opening bid date was April 6, 2006, at 3:00 p.m. P.S.T., at which time OPS2's sealed bid was opened revealing its bid of $8,583,710.82 for the accounts with the number reached

1  by multiplying the total value of the accounts receivables by 1.26%.  The bid contained the

2  following caveat in small print: ("Contingent on mutual agreement on Purchase & Sale Agreement

3  and a cut-off date that corresponded to date of creation of data files that tie back to the

4  $681,246,890.28"). (Ex. 306 p. 1.)

5      49.  The bid submitted by OPS2 did not contain a separate sheet of paper entitled

6  "Deviations to Bid Conditions" as required per the bid instructions. (Ex. 306.)  OPS2

7  acknowledged receipt and awareness of Addendum No. 1 to Bid No. 2006-06 and the two

8  subsequent addenda in its April 6, 2006 bid. (Ex. 306 p. 3.)

9      50.  OPS2's bid specifically conditioned its acceptance upon a subsequent negotiation of

10  an Account Purchase Agreement with terms that were mutually agreeable.  The ITB and its

11  addenda did not allow for a bid to be placed on such an open-ended contingency such that OPS2

12  had unfettered discretion to abandon its bid.  OPS2 gained a material advantage to be able to

13  negotiate one-on-one with a UMC representative after bid opening.  It also gained a material

14  advantage over bidders and prospective bidders alike in bidding itself into a negotiation without

15  having any monetary stake should it decide that it could not agree with UMC's terms at the end of

16  future negotiations.

17      51.  OPS2 did not, prior to submitting its bid, ever utilize a bid protest to seek

18  clarification of any provision in the ITB and its addendum. OPS2 did not inform UMC in its bid of

19  any proposed, substantive deviations upon which the offer was contingent.[1]

20      52.  On April 18, 2006, UMC CEO Lacy Thomas submitted an agenda item for the

21  Board of Hospital Trustees/Clark County Board of Commissioners ("Board") recommending it

22

23      [1]  The Court acknowledges Exhibit 7 wherein Mr. Sett, in an e-mail to Helvie on March 30, 2006,

24  identified two specific concerns to be fleshed out in the agreement regarding ownership and "free and clear title" for the accounts included in the lot for sale. The Court is not persuaded that Mr. Sett's use of "etc." at the end

25  of that list in his e-mail reserved a Pandora's Box of contingencies. Even if Mr. Sett's assertion is true in his mind that Helvie authorized a bid contingent upon "etc", the ITB (Ex. 305 p. 2)  as well as the opinion of the Nevada Supreme Court in *Orion Portfolio Services, 2 v. County of Clark*, 126 Nev. Adv. Op. 39, 245 P.3d 527, 534 n.

26  5 (2010) (*en banc*) make it clear this communication and Mr. Sett's subjective belief about it are irrelevant.

award Bid No. 2006-06, Accounts Receivable Sale, to OPS2 as the highest, responsible bidder. (Ex. 317.)

53.    The recommendation was designated to be part of the consent agenda at the April 18, 2006 meeting.  Prior to the meeting, the Board was only informed that, among the three bids submitted, the amount bid by OPS2 was highest.  It was not given a copy of the OPS2's bid or any proposed contract.

54.    Based on this limited information, the Board accepted the recommendation and awarded "the sale of one lot of Aged Accounts Receivables" to OPS2 and "authorize[d] the Chief Executive Officer [Thomas] to sign the necessary documents to effectuate the sale."  (Ex. 316.)

55.    Because the sale exceeded $500,000.00, Board approval was necessary for any resulting contract arising from the Invitation to Bid and its addenda.

56.    After the bids were opened, but before bid approval, Sett and his lawyer began negotiating with Don Haight ("Haight"), contract administrator for UMC, and Thomas to create (as Sett testified, "from scratch") a contract for the purchase of the accounts receivable.

57.    Sett utilized a contract he had used for the sale of accounts from a private sale as a model and sent Haight a draft document entitled Account Purchase Agreement ("APA").  He did not make any attempt to conform the draft agreement to the terms and conditions set forth in the ITB.  He did however meet with Christy to discuss the particular exclusions of accounts that they now believed should be a part of the contract in order to put back certain accounts for repurchase or replacement with more valued and collectible ones.

58.    Several versions of the APA were still passed between OPS2's legal representatives and Haight. (Exs. 11, 12 and 15.)

59.    On May 16, 2006, OPS2, through its representative Sett, and Thomas executed the APA for the transfer of the subject accounts. (Ex. 307.)  This contract was never submitted to the Board for approval.

60.    The APA varied from the ITB and the Addendums in the following areas:

a.  The APA specifically demanded of UMC twenty-five separate representations in Sections 3.2, 3.4 and 7.2 regarding the subject portfolio which were not found in the ITB.   (Ex. 307, pp. 5-7, 11-12.)[2]

b.  Section 7.2 of the APA calls for wide-scale substitution or replacement of accounts for any breach of the 25 warranties contained in Sections 3.2, 3.4 and 7.2 **"without regard to any knowledge qualification to such representation or warranty** . . ." (Ex. 307 p. 12.)

c.  The APA mandated replacement accounts for any one of the 25 disqualifying warranties.

d.  Although the ITB suggested, in Special Provision 13, that if UMC elected to repurchase or replace accounts such replacement would only be of "an account of equal value and aging within a 60-day plus or minus range,"the APA mandated that substitute or replacement accounts be originated on or after January 1, 2004 and not to have an unpaid balance to exceed $10,000. (Ex. 307 p. 3.)  This provision would potentially require replacement of an account deemed uncollectible because of its dollar value and/or age with a fresher account with a dollar range in what Feeney testified was the "sweet spot" for collections–rendering the substituted accounts much more collectible than those which had been purchased in the lot.[3]

---

[2]  Section 3.2 mandated marketable title free and clear of all liens, charges or encumbrances.   The representations and warranties in Section 3.4 included the following: (a) that the information on a closing list of accounts is true and correct; (b) there will be no requirement for future advances or performances by OPS2; (c) none of the account debtors have disputed or threatened litigation or other legal proceeding; (d) no account is subject to any pending litigation or other legal proceeding; (e) no account has been discharged in bankruptcy and no account debtor has filed for bankruptcy or become the subject of any bankruptcy proceeding; (f) no account debtor is represented by counsel; (g) no account debtor is deceased; (h) no final judgments have been entered with respect to any account; (i) each account represents a bona fide indebtedness; (j) the accounts have been originated, maintained, serviced and charged off in compliance with all applicable federal laws; (k) neither UMC nor any of its agents have offered or mailed any settlement offers to account debtors; (l) UMC has not included any account debtors that are eligible for medical, or Federal, State or County aid; (m) UMC has not overcharged for services rendered on any account; (n) no accounts constitute have balances that are for contractual write offs or capped judgments; (o) no accounts involve denials by insurance companies for untimely filing; (p) no accounts constitute include those where settlement payments were received and not applied to unpaid balance; (q) no accounts involve pending Workers Compensation claims; (r) no accounts constitute those where services were not rendered; (s) no accounts constitute those where an unpaid balance is unverifiable or invalid based on conditions of admission; (t) UMC did not use any mechanisms to adversely select the accounts; (u) no account debtor is a governmental entity or political subdivision; and (v) the unpaid balance listed is true and correct. Section 7.2 warranted no claim or defense existed to payments on the accounts; there were no judgments on the accounts; the accounts were not created as a result of fraud, forgery or mistake; and no account debtor had been released from liability on the account nor had it been satisfied, compromised or settled.

[3]  William Ayers testified his discussion with an experienced receivables purchase, that accounts receivable with an outstanding balance over $50,000.00 should be treated as having zero value.

e.      Page 2 of the APA, defining "Equivalent Value" of substitute accounts, indicated for accounts potentially barred by the statute of limitations ("originated prior to January 1, 2000") and, therefore, without collectible value[4] must be substituted with a post January 1, 2004 account at 50% of the older account's face value. (Ex. 307 p. 2.)

f.      The APA mandated a post-sale "scrub" of the one lot of sold accounts receivable at UMC's expense–even though there was no guarantee in the ITB concerning bankruptcies and deaths and no obligation to conduct a post-sale "scrub" for such issues. (Ex. 307 p. 4.)

g.      The APA overrode the elective power of UMC to "repurchase or replace ineligible accounts due to a filed bankruptcy or documented death certificate notifications" (Ex. 305 p. 7) by mandating substitution of "Equivalent Value" for any account "where the Account debtor has filed for bankruptcy or become the subject of any bankruptcy proceeding" or "is deceased." (Ex. 307 pp. 6, 12.)  The APA thus materially differed from the ITB in that it removed UMC's discretion and covered a much broader range of accounts.[5]

h.      The only representation the ITB made with respect to settlement offers was that no "structured settlement" offers had been made to the account debtors in the lot.[6]  The APA, however, disqualified any account where "Seller or any of its agents have offered or mailed settlement offers to the Account Debtors." (Ex. 307 pp. 6, 12.)

i.      ITB Special Provision 18, in Addendum Number 1, expressly included accounts eligible for Medicare in the one lot of accounts receivables. (Ex. 302 p. 2.)  The APA acknowledged OPS2 would be pursuing Medicare and Medicaid Accounts with UMC providing it documents to do so. (Ex. 307 p. 10.) However, it still subjected these accounts to mandatory substitution with a 2004 or newer account of "Equivalent Value." (Ex. 307 pp. 6, 12.)

---

[4] Ayers testified in his interview with the experienced receivables purchaser, he was informed accounts which were beyond 120 months from date of service should be treated as having zero value.

[5] The ITB gave UMC the option to replace an account discharged in bankruptcy or where the successful bidder produced a death certificate. The APA, however, mandated substitution for any account debtor who had filed for bankruptcy or "become the subject of any bankruptcy proceeding"–without regard to whether the debt was successfully discharged pre-sale.  The APA additionally required substitution for any alleged death without the need to provide documentation through a death certificate.

[6] The Court is unpersuaded that the e-mail correspondence between Sett and Helvie modified the ITB and its addenda so as to guarantee that none of the accounts had been previously offered a settlement before the sale.  First, Helvie in his e-mail response to Sett reaffirmed that the ITB only addressed "structured settlements" not any settlement. (Ex. #8.) Second, the ITB specifically prohibits any amendments that are not in writing and distributed to all bidders. Third, the testimony establishes that collection companies as a normal part of their collection efforts offer debtors a discount on the total owed to facilitate collections.  Sett had actual knowledge Aargon and Allied did so for the UMC accounts on occasion as Christy and Feeney informed him of this when he consulted with them before submitting OPS2's bid.

j.   The only assistance the ITB promised to bidders for collections on the accounts, as it related to account documentation, was that "Patient[s] will be able to request itemized charges and medical records.  Records will be paper copies." (Ex. 302 p. 3.)  The APA however obliged UMC to provide OPS2 reasonable access to "any Account Documents" as well as to enjoy unfettered "on-line access" to UMC's records storage system. (Ex. 307 p. 10.)

k.   The APA, in paragraph 10.8, states the APA reflects the entire understanding of the parties and supersedes all prior agreements. Therefore, it specifically disregards the ITB and its addendums. (Ex. 307 p. 14.)

l.   The APA, however, omits several clauses which were contained in the ITB. Among the clauses included in the ITB but omitted from the APA were the clauses entitled: (1) Discrimination; (2) Assignment of Contractual Rights; (3) Termination for Convenience; and (4) Termination for Cause.

m.   The ITB contains a clause requiring the successful bidder to indemnify and hold UMC harmless from any liability arising from the contractor's performance of such services.  (Ex. 305, p.2.)  However, no such clause is contained in the APA. (Ex. 305 p. 2.)

n.   The ITB imposes requirements upon the bidder to maintain specified insurance coverage for the duration of the contract. (Ex. 305 p. 6.) However, no such insurance coverage is required under the APA.  To the contrary, the APA imposes insurance requirements only upon UMC. (Ex. 307 pp. 7, 11.)

o.   The APA included, despite the ITB's silence on these substantive subjects, the waiver of UMC's sovereign immunity and a recovery right of attorneys fees and costs by OPS2.[7] (Ex. 307 pp. 5, 14.)

61.   Each of these deviations inured to the benefit of OPS2 and gave it a material advantage over bidders and prospective bidders and undermined the public's interest in compliance with the competitive bid process. The deviations increased the potential profitability of the accounts by markedly increasing their collectability and value as a whole, while decreasing the financial expenditures OPS2 would have to invest to collect on the accounts. These material advantages given to OPS2 came without a corresponding increase to the public coffers.

---

[7]  The Court takes judicial notice that the waiver of sovereign immunity is only by the legislature--not by contracting officials.  The limitations for recovery of attorney fees are also a matter of statutory law and cannot be waived or altered.

62.     On May 18, 2006, Sett and Thomas executed an Amendment to the APA

("Amendment Number 1") allowing OPS2 to only pay $5,740,881.54 for the account portfolio.

(Ex. 308.) This amendment reduced the sale price by $2,842,828.82. This figure was comprised of

two considerations: (1) a $2.2 million dollar "hold back" to account for adjustments OPS2 desired

for the post-sale scrub by UMC mandated in the APA; and (2) a dollar-for-dollar reduction in the

sale price for monies which had been received by UMC on accounts sold from March 20, 2006

until April 30, 2006.[8] (Ex. 308 pp. 1-2.)

63.     Amendment Number 1 deviated from the ITB and the Addendums in the following

areas:

a.  Addendum 3 to the ITB required OPS2 to present a cashiers check for its
    "highest" bid by 10:00 a.m. on April 18, 2006–before the Board's meeting.
    (Ex. 304.)
b.  The payment time per the APA and Amendment 1 was extended until after
    Amendment 1 was executed.
c.  OPS2 was effectively allowed a late-paid 1/3 reduction in the purchase price
    from its accepted bid.
d.  Addendum Number 1 (Ex. 302 p. 1) specifically noted the total amount of
    the account receivables portfolio would be reduced for payments posted
    prior to the transfer dates or withheld due to current payment
    arrangements/judgments. (Ex. 308 p. 1-2.)  Amendment Number 1 gave
    OPS2 a dollar-for-dollar reduction on the account purchase price by
    reducing the total owed by OPS2 for the portfolio by the total received by
    UMC on the accounts from March 20, 2006 through May 23, 2006.[9]

64.     As with the deviations between the ITB and the original APA, the deviations

between Amendment 1 and the ITB are also material.  They also inured to the benefit of OPS2 and

---

[8]  Although Amendment 1 required a reduction of $642,829.28, the evidence establishes UMC only collected $464,098.44 during the relevant time. (Ex. 321 p. 1.)

[9]  OPS2 argues its bid of approximately $8.6 million dollars was not a sum certain for the lot of accounts on the disc but rather a "fluid" figure based on the total value of accounts actually transferred at a purchase rate of 1.26%. Fidelity to Addendum Number 1 under that theory would have resulted in a reduction of the purchase price of only $8,099.65 as opposed to the $642,829.28 mandated under Amendment Number 1.  In addition, the reduction of the purchase price in Amendment1 by approximately $643,000  overstates the actual collections of UMC (and corresponding reduction during the relevant time period from March to May 2006) by $178,730.84. (Ex. 321 p. 1.)

1    directly and markedly affected price. The unauthorized 1/3 reduction of $2,842,828.82 from

2    $8,583,710.82 lowered OPS2's effective percentage on the bid from 1.26% to 0.84%.[10]

3         65.    On June 19, 2006, Sett and Thomas executed Amendment 2 to the APA with a new

4    agreement regarding judgment accounts. (Exs. 329 and 330.)

5         66.    Addendum Number 1 to the ITB stated there would a reduction in the value of the

6    accounts receivables sold for accounts which had either payment arrangement accounts or

7    judgments as those accounts would be withheld by UMC.[11] (Ex. 302 p. 1.)  In addition, UMC

8    represented in answer to question in Addendum 1 that none of the accounts transferred would

9    include judgments. (Ex. 302 p. 3.)  Nevertheless, Amendment 2 transferred those

10   accounts–increasing the profitability and collectability–without a corresponding increase in the

11   purchase price. (Exs. 329 and 330.)

12        67.    Neither Amendment 1 nor Amendment 2 were ever submitted to the Board for

13   approval.

14        68.    UMC did not received the $2,842,828.82 difference from the bid award amount.

15        69.    OPS2, after bid opening, was therefore able to lower its bid substantially to an

16   amount which was only slightly higher than the next highest bid. (Ex. 317.)  In addition to

17   lowering its bid 33% it was also able to negotiate a contract and amendments to the contract that

18   markedly modified the ITB and its amendments so as to give OPS2 numerous additional benefits

19   that increased the value of the account portfolio, increased the likelihood of collectability on the

---

22        [10]  Even if the Court decided to use the speculative information found on Exhibit #234 suggesting the
23   value of accounts actually transferred to OPS2 from the sale was only $562,387,712.60 plus the $3,993,411.00
     (reflecting Allied's judgment accounts), the effective percentage of account receivable bid is 1.01%.  This still
24   represents a 20% reduction from the 1.26% bid—material deviation in and of itself.

25        [11]  From the evidence, it is clear an account that has gone to judgment would be a valuable revenue
     source for UMC as the requisite legal work had already been performed and the recovery rate on judgments, as
26   testified to by Michael Feeney and Mark Bourassa, is substantively higher than collections from non-judgments.
     Hence, it is sensible that UMC would want to keep such accounts.

AO 72
(Rev. 8/82)

accounts and diminished costs and the level of resources needed by OPS2 to collect on the accounts.

70.     OPS2 subsequently attempted to enforce the terms of the Section 7.2 of the APA requiring UMC to substitute the potentially uncollectible accounts for newer accounts. (Ex. 346.) The alleged amount of the total accounts for which OPS2 sought substitution with UMC accounts outside of the lot with dates of service on or after January 1, 2004 was a total of $83,752,584.57.[12] (Ex. 232.)

71.     Following disagreement regarding the scope of the APA substitution clause, OPS2 then submitted a third Amendment to be signed by Thomas in November of 2006.

72.     After this third Amendment was prepared by OPS2, Holly Gordon (the civil DA assigned to UMC) became aware of the APA, the two Amendments to that purported Agreement and the proposed Third Amendment as well as the disputes that had arisen from them.

73.     Upon learning this information[13] and under the legal counsel of the Clark County District Attorney's Office, UMC rejected the proposed Third Amendment along with the APA and the first two amendments in a letter prepared by Ms. Gordon on March 22, 2007.  (Ex. 309.)  She indicated also further negotiations to resolve the ongoing disputes would be resolved by the four corners of the ITB and its addenda. (Ex. 309 p. 2.)

---

[12]  The Court notes that there was no evidence provided supporting the numbers behind Exhibit #232 either verifying their accuracy or describing how they were adduced.  The only witness with knowledge on this matter was Larry Christman ("Christman").  He, however, could not testify to the accuracy of the numbers or provide any details about how the alleged non-conforming accounts were identified. For instance, OPS2 claimed that the total value of the accounts closed per client was $2,746,235.97. (Ex. 232.)  Yet the only evidence of accounts UMC requested to be closed comes from Exhibit #370.  The total of these accounts is approximately $25,000 for 55 accounts. (Ex. 370 pp. 2-3.)  There was also a failure of evidence establishing that any of the accounts were discharged in bankruptcy, involved debtors which OPS2 could establish were deceased through a death certificate or that any account debtors were offered any structured settlement as contemplated by the ITB. (Ex. 302 p. 3; Ex. 305 p. 7.)  There was no evidence any of the accounts were subject to the medicare or medicaid exclusion in the APA either.

[13]  The Court finds the e-mail statements by Haight that the District Attorney's office was aware of the APA and was threatening to sue OPS2 if it did not execute the APA in Exhibit 15 were most likely untrue.  It makes no logical sense for the DA to say that the APA is void and at the same time threaten to sue if OPS2 didn't sign it.

74.     After receiving the accounts receivable portfolio from UMC, OPS2 transferred all accounts–save Allied's judgments–to Christy and Aargon.

75.     Christy used the same methodology towards collection for OPS2 that he had for UMC.  Aargon had sufficient manpower, technology, tactics and motivation to be considered a superior collection agency.

76.     Christy reported his first 12 months of collections for OPS2 was very lucrative and went "very well."

77.     Aargon collected less than 1% of the transferred portfolio the first 12 months. After 18 months, Aargon had only collected a total of 1.2% of the transferred portfolio.[14]

78.     The highest collections success on a purchased account receivable portfolio occurs within the first 12 to 18 months after purchase. Thereafter, the liquidation rates decrease dramatically.

79.     In the subsequent 12 months (2008), Aargon collected an additional 0.26% of the transferred portfolio. In 2009, Aargon's collections dropped to 0.092%.  Through March of 2012, OPS2 collected a total of $9,426,236.52 or 1.68% of the transferred portfolio.[15]

80.     There is no credible evidence that the access provided OPS2 from May 19, 2006 to the present had a substantive negative impact on either OPS2's non-litigation collection efforts or litigation collection efforts.[16]

---

[14]   The 1.2% uses the speculative portfolio value found in Exhibit #234.  If a portfolio value of $680,782,791.84 is utilized (the value of the portfolio identified in Addendum Number 1 less collections up to April 30, 3006), Aargon's liquidation rate drops to 1.02%.

[15]   Using the actual portfolio value transferred as set forth in the ITB, the number drops to 1.38%.

[16]   For litigation accounts, there was a number of valid vehicles by which any requisite documents could have been obtained to validate and prove up debts.  Including but not limited to the issuance of subpoenas, written discovery and the application of Section 6.6 in the APA. [Ex. 307 p. 10].  Christy in fact recommended to Sett that they ought to use a subpoena on UMC to obtain documents in litigation cases. [Ex. 52]. The Court finds the more likely source of problems with collection efforts to be the negative publicity generated by Aargon's collection efforts on behalf of OPS2.

AO 72
(Rev. 8/82)

81.     William Ayers ("Ayers") and John Collier ("Collier") provided testimony about collection rates and expected returns but those opinions were speculative and failed to account for the unique nature of the subject accounts or the community from which they were generated.[17] Further, they could not establish any foundation for the numbers they utilized in formulating their opinions concerning the value of substantive accounts and no other witness established those numbers either.

82.     The opinions of Ayers and Collier fail to meet the standards of Federal Rule of Evidence 702.

83.     The Court finds the allegations surrounding UMC's receipt of the Teni Azjeri check to be unfounded.  Even if true, however, the allegation provide no basis for a damage award in this case.  OPS2 has at best established that Myers placed the check in an envelope to give to Aargon. There is no breach of contract for Myers' alleged conduct and there is no other claim in the suit to impose liability against UMC for this alleged conduct.

84.     UMC has directly received payment on some of the accounts that were included in the one lot of accounts placed on the disc. The total amount received by UMC from March 20, 2006, up through end of March 2012 on over 5,559 of these particular accounts, is $1,124,286.46. UMC received approximately 84% of this total during the first six months after transfer of the account and nearly 90% of the total was received in the first year after transfer. [Ex. 321].

85.     OPS2's allegation that UMC's retention of this money provides a basis for damages is also unfounded.  First, OPS2 has already been credited with $642,829.28 as part of the over-stated Pre-Closing Netted Collections figure of Section 2.4 of Amendment 1 to the APA. [Exs. 308 p. 2].  OPS2's claim that it is owed the money UMC received in March - April 2006 of the

---

[17] The number is, further, objectively invalid. Collier stated after twenty-four months following the sale OPS2 would have collected virtually all the money it would ever collect on these accounts. Taking the amount of conforming accounts non-litigation accounts identified by Mr. Collier and applying the presumed collection rate, supplied by Mr. Ayers, the number reached for this small sub-set of the total portfolio was well over twice the total moneys collected within that period of time including litigation collections

1    accounts in the portfolio is another attempt to have a double recovery.  OPS2 was in effect already

2    paid by the reduction of the purchase price by approximately $643,000 based upon UMC's

3    receivables on these accounts during this time.

4         86.    Further, the remaining $481,457.18 is subsumed by OPS2's offset retention of the

5    entire $2.2 million dollar hold-back and the retention of nearly $4 million dollars of Allied's

6    judgments. Even assuming the scrub performed by UMC and the resulting hold-back from the

7    scrub for alleged deceased or bankrupt debtors were not material deviations from the ITB and its

8    addenda, the evidence establishes OPS2's retention of the $2,200,000 from the scrub was

9    considerably more than the value of accounts turned up in the scrub.  This fact is established

10   through the testimony of Collier and the fact that OPS2 paid less than 1.26% of all accounts that it

11   states are conforming under the APA.

12        87.    If this Court were to consider the number mentioned by Collier reflecting the

13   alleged value of accounts which were conforming and non-litigation, OPS2 paid substantially less

14   for these accounts than it bid. An application of the 1.26% purchase rate to this smaller number of

15   APA conforming accounts reveals as of today OPS2 has still underpaid UMC in the amount of

16   $340,238.04 (i.e., $482,628,538.43 x .0126 = $6,081,119.58 and subtracting the paid

17   $5,740,881.64 from that number = $340,238.04).  In other words, if the Court were to credit OPS2

18   for the value of every account it alleges is non-conforming is under the APA and assign these

19   accounts a zero value, OPS2 still underpaid for the remaining "conforming" accounts in the

20   portfolio at their 1.26% bid rate by over $340,000.00.

21        88.    The Court further notes the potential for OPS2 to have recovered money from the

22   accounts it seeks to have substituted. The APA permitted OPS2 to both collect on

23   medicare/medicaid accounts as well as obtain substitution for those same accounts. [Ex. 307 pp. 6,

24   10, 12].  OPS2 under the APA could theoretically collect from Account debtors, who have filed

25   for bankruptcy at one point, if the UMC debt has not been discharged and obtain payment of debts

26   /

AO 72
(Rev. 8/82)

from decedent's estates and yet still declare these accounts non-conforming and subject to substitution.

89.     In addition, OPS2 would have received money from the settlement campaign effort employed by Aargon from May 1, 2006 to the end of the month when the alleged offers expired per the letter.[18] [Ex. 47].  If any debtors paid UMC following their receipt of Aargon's letter writing campaign in May of 2006, OPS2 as noted already reduced their purchase price by this amount at a dollar for dollar reduction per Amendment 1 to the APA. [Ex. 308]. If the debtors paid Aargon after the date of transfer, OPS2 directly received these payments.  Notwithstanding the reduction of the purchase price or the receipt of these settlement monies, the APA required UMC to substitute these accounts simply by the debtor's receipt of the letter and thus effectively allowing OPS2 to double dip regardless of whether the payments went to UMC or Aargon. OPS2's attempt to recover the money received by UMC in March - May of 2006 is an attempt "triple dip" by being credited again from the same pool of paid accounts.  *See infra* ¶ 92.

90.     In light of the foregoing, the Court finds OPS2 recovery of $9,426,236.52 from the sold accounts to date, given their dramatically reduced payment of only $5,740,881.54 in May of 2006 for these accounts, to be a more than reasonable compensation for their efforts.[19]

91.     If any Finding of Fact is also considered a Conclusion of Law it is the Court's intention that it be so considered.

_____

[18]  The letters sent by Aargon to account debtors establish that these debtors were not offered a structured settlement in the mail.  Indeed, the form letter in evidence as Exhibit #47 suggests that these letters do not constitute a legal offer to settle at all.  The form letter sent out by Aargon to debtors merely states: "We are prepared to offer a settlement of [percentage] of the balance due." It then requests the debtor to contact Aargon to discuss settlement with such "offer" open for thirty days. [Ex. 47].

[19]  No testimony or evidence exists regarding the interest rates paid by OPS2 to borrow any monies used to purchase the lot of accounts receivable from UMC.  Any work done by debt collectors to collect on these accounts has already been paid to them.

**CONCLUSIONS OF LAW**

1.      The APA contained material deviations from the ITB and is therefore void.  OPS2's bid did not confirm to the bid specifications and therefore the ITB did not become a contract between the parties.  *Orion Portfolio Serv. 2, LLC v. County of Clark ex rel. Univ. Med. Ctr. of Southern Nevada*, 245 P.3d 527, 533 (2010) (A "contract is void if it materially differs from the contents of the invitation to bid." ).

2.      The Court concludes that the differences between the APA and the ITB are material because they were objectively capable of affecting the amount of the bid or giving a bidder an advantage or benefit that other bidders or prospective bidders did not enjoy.  *See Cypress Security, LLC v. City and County of San Francisco*, 109 Cal. Rptr. 3d 107, 117 (2010) (stating a variance is allowable only if it "cannot have affected the amount of the bid or given a bidder an advantage or benefit not allowed other bidders").

3.      Additionally, OPS2 failed to make certain that the APA contained no material deviations from the ITB. On this point, the Nevada Supreme Court unanimously held:

> As UMC points out, not only must municipal contracts be formed with no material variations from the specifications, but it is the burden of the private entity to assure compliance.  "The rule is firmly established that one who makes a contract with a municipal corporation or administrative agency is bound to take notice of the limitations of its power to contract." *Hanna v. Board of Education of Wicomico County*, 87 A.2d 846, 850 (Md. 1952); *see* 13 Eugene McQuillin, *The Law of Municipal Corporations* § 37:99 (3d ed. 2008).

*Orion*, 245 P.3d at 534 n.5; *see also Schaefer v. Anne Arundel County, MD.*, 17 F.3d 711, 714 (4th Cir. 1994) ("it seems more reasonable that an individual should occasionally suffer from the mistakes of public agents or officials, than to adopt a rule, which, through improper combinations or collusion, might be turned to the detriment and injury of the public. . . . Thus, persons who contract with the government do so at their own peril when they fail to take notice of the limits of the agent's authority.").

/

4.      The words "structured settlement" as used in Exhibit 302 at page 3 means a settlement offer made calling for periodic payments over time. *See*, *e.g.*, 26 U.S.C. § 5891(c)(1). The ITB did not prohibit the inclusion of accounts offered other types of settlements.  The Court further finds the words under Special Provision 13 stating UMC had the right to elect to repurchase or replace "ineligible Accounts due to a filed bankruptcy" means that this election applied to UMC debts that were discharged in a bankruptcy.  The election attached with the account becoming ineligible due to a filed bankruptcy as opposed to any bankruptcy merely involving the debtor.

5.      The APA and the executed Amendments to the APA are void because they contain various terms not included in the ITB and its addenda and exclude various terms that were included in the ITB and its addenda.  Certain of these deviations are material in and of themselves and certain other deviations cumulate to become material as they clearly affect the price and the quantity and quality of the account portfolio in total.

6.      The guarantees in Section 3.4 of the APA, enabling OPS2 to disqualify numerous accounts in the portfolio identified in the ITB that included hundreds of thousands of accounts that came without guarantee of collectability with newer accounts free of any indicia of non-collectability, are material, either individually or cumulatively.  (Ex. 307, Section 3.4.)

7.      The substitute accounts provision included in Section 7.2 of the APA and not provided for in the ITB clearly affects the price, quantity and quality of what was included in the bid, and is material.

8.      The hold-back provisions in the APA and Amendment 1 enabling OPS2 to pay UMC only $5,740,882 of its bid of $8,583,710.82 (a discount of approximately 33%) is also a material deviation and demonstrates the problem with changing terms and conditions of a bid

/

/

/

1    when negotiating a contract with a governmental entity after a bid award in the competitive

2    bidding process.[20]

3          9.    The APA provision calling for UMC to provide documentation of the debts and

4    permitting OPS2 on-line access to computers is also a material deviation from the ITB as the ITB

5    only stated that patients will be provided itemized bills when there was a challenge to the debt.

6    The availability of these UMC resources makes the portfolio more valuable as collection

7    percentage would increase and consequently affect the valuation of the bid.  It further places a

8    resource burden and increased costs on UMC and thus the taxpayers that was not revealed to the

9    public in the ITB.

10         10.   The inclusion of the provisions in the ABA waiving sovereign immunity, requiring

11   insurance coverage, and allowing for attorney fees are further material deviations from the ITB as

12   this additional conditions also affect valuation of the bid for both the public and the potential

13   bidders.

14         11.   The exclusion of certain terms in the ITB from the APA, specifically (1)

15   Discrimination; (2) Assignment of Contractual Rights; (3) Termination for Convenience; and (4)

16   Termination for Cause, are further material deviations as they increase UMC liabilities and ability

17   to terminate the contract which also substantively affect the quality and price of the bid.

18         12.   UMC did not violate the covenant of good faith and fair dealing because UMC and

19   OPS2 failed to enter into a valid contract. As the Court has previously stated, the material

20   deviations between the ITB and the APA make the APA void.

21         13.   In Nevada, a noncomplying governmental contract that is declared void denies the

22   possibility of any equitable recovery, even when work has been performed and the governmental

23   unit has received the benefit of that performance.  *Blaine Equipment Co., Inc. v. State*, 138 P.3d

24   820, 824 (2006).  Therefore, OPS2 cannot recover for any equitable claim including unjust

25   _____

26         [20] This also demonstrates why Section 3.4 of the APA (the account representations and warranties) is
     materially different from the terms of the ITB affecting of the price of the bid or eventual actual payment.

AO 72
(Rev. 8/82)

1   enrichment and a *quanum meruit* theory.  Further, even if the Court could grant equitable relief, it

2   would not do so because OPS2 has not sufficiently proven actual damages.  OPS2 has received

3   more than reasonable compensation for its services from the monies it has already collected from

4   the accounts in the portfolio of $9,426,236.52.

5        14.    Therefore, UMC has not deprived OPS2 of a benefit that justly belongs to OPS2.

6   "[U]njust enrichment occurs whenever a person has and retains a benefit which in equity and good

7   conscience belongs to another. Unjust enrichment is the unjust retention of a benefit to the loss of

8   another...." *Nevada Industrial Dev. v. Benedetti*, 741 P.2d 802, 804 n. 2 (1987) (citations omitted).

9        15.    It has been demonstrated by a preponderance of the evidence that OPS2 was

10   enriched by its dealings with UMC of an amount far greater than it was justly due under the ITB

11   and its addenda.  It even paid less than it owed UMC using OPS2 own bid rate for accounts it

12   determined was free and clear of the guarantees embodied in the APA–which are all still material

13   deviations from the ITB and its addenda.

14        16.    If any Conclusion of Law is considered a Finding of Fact it is the Court's intention

15   that it be so considered.

**DECISION**

17        Based upon the foregoing, it is the decision of the Court that the APA is void

18   because it materially differed from the ITB, and OPS2 cannot recover for any breach thereof.

19   Furthermore, OPS2 has no valid claim for: (1) breach of the covenant of good faith and fair

20   dealing; (2) *quantum meruit*; or (3) unjust enrichment.

21        Dated: May 9, 2012.

23   _____

24   **ROGER L. HUNT**
    **United States District Judge**

AO 72
(Rev. 8/82)